## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**RANDALL THIBODEAUX**

**CIVIL ACTION**

**VERSUS**

**NO. 22-CV-15-JWD-EWD**

**EQUINOR USA E&P, INC., ET AL.**

### RULING ON EQUINOR'S MOTION FOR SUMMARY JUDGMENT

Before the Court is *Equinor's Motion for Summary Judgment* ("Motion"), (Doc. 37), brought by defendant Equinor USA E&P Inc. ("Equinor" or "Defendant"). It is opposed by plaintiff Randall Thibodeaux ("Plaintiff" or "Thibodeaux"). (Doc. 60.) Equinor filed a reply brief. (Doc. 61.) The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the Motion is denied.

### I.    BACKGROUND FACTS

This case arises from an accident which occurred on July 17, 2021, on an offshore production platform on the Outer Continental Shelf ("OCS") of the Gulf of Mexico. (SUMF, Doc. 37-2 at ¶¶ 1, 30.)[1] The platform, the Titan, was owned by Equinor and located in block Mississippi Canyon 941 on the OCS. (*Id.* at ¶ 1.) In a Master Service Agreement ("MSA"), Danos, LLC ("Danos") contracted with Equinor to provide personnel services on the Titan. (*Id.* at ¶ 2 (citing, *inter alia*, Ex. 1A, Equinor/Danos MSA, Doc. 37-4 at 7).) Beginning in December of 2018, Danos

---

[1] Unless the Court notes otherwise, the facts summarized in this section are from Equinor's Statement of Uncontested Material Facts ("SUMF"), (Doc. 37-2), or from Plaintiff's Additional Facts ("PAF"), (Doc. 53-1 at 6), and are either admitted outright or are qualified in such a way as to admit the statement cited. (*See* PAF, Doc. 53-1 at 1–6; Equinor's Reply Statement of Material Facts ("Equinor's Response to PAF"), Doc. 61-1 at 1–15.)

"hired Plaintiff as an instrumentation and electrical technician assigned to the Titan Platform." (*Id.* at ¶ 5.)

Equinor contracted with Premier Offshore Catering ("Premier") to provide meals for contractors on the Titan. (Equinor's Response to PAF, Doc. 61-1 at ¶ 22.) Premier, in turn, ordered the groceries from Acadia Wholesale & Tobacco, Inc. ("Acadia"), which packaged the groceries in 18" x 12" x 12" cardboard boxes and stacked the boxes on pallets that were delivered to the deck of the Titan. (*Id.* at ¶ 23.)[2] On July 17, 2021, Equinor assigned Plaintiff to work as part of a "human chain" to move the grocery boxes from the pallets to the place where they would be stored on the platform. (*Id.* at ¶ 24.)

Plaintiff claims he was injured in the following way: "As Mr. Thibodeaux was holding the box out at approximately shoulder height, twisting, and 'handling it in an upward position,' the box's cut-out handle failed and caused him to 'jerk something in his back' as he reacted to losing control of the grocery box." (PAF, Doc. 53-1 at ¶ 31.) Equinor disputes that Thibodeaux had to (or did) twist to perform the lift and contends that "it was only after the box handle tore that Plaintiff claims he then twisted." (Equinor's Response to PAF, Doc. 61-1 at ¶ 31.)

Plaintiff alleges that the box was "unusually heavy" (60–80 pounds), (Doc. 60 at 4, 26), and that Equinor was negligent in a variety of ways that caused Plaintiff's injuries, (*see, e.g.*, *id.* at 26–27; Equinor's Response to PAF, Doc. 61-1 at ¶¶ 27–42), including failing to follow its own Job Safety Analysis ("JSA") policies and procedures (Equinor's Response to PAF, Doc. 61-1 at ¶ 37); "fail[ing] to implement simple controls that could have prevented [Plaintiff] from making this unsafe lift" (Doc. 60 at 26–27); and "fail[ing] to provide [Plaintiff] with a reasonable safety and health program that dealt with ergonomic issues that met standard industry work practices."

---

[2] Acadia, also a defendant, has filed its own motion for summary judgment. (Doc. 26.)

(*Id*. at 27 (citation omitted).) More specific allegations of fault, denied by Equinor, can be found in PAF. (*See, e.g.*, Equinor's Response to PAF, Doc. 61-1 at ¶¶ 27–41.)

Plaintiff brings this action under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §1331 *et seq.*, which applies Louisiana tort law unless there is an inconsistent federal law. *Parkman v. W&T Offshore, Inc.*, 544 F. Supp. 3d 642, 648 (M.D. La. 2021). Equinor brings this Motion "on two independent and alternative grounds: (1) Equinor's tort immunity as Plaintiff's borrowing employer and (2) Equinor's lack of negligence." (Doc 37 at 1.)

## II.  SUMMARY OF ARGUMENTS OF THE PARTIES – BORROWED EMPLOYEE ISSUE

### A.  Equinor

Equinor argues that Plaintiff is its borrowed employee, and, therefore, Equinor is immune from suit by virtue of § 905(a) of the Longshore and Harbor Workers Compensation Act ("LHWCA") (LHWCA's exclusivity provision, 33 U.S.C. § 905(a)). (Doc. 37-1 at 2, 6–17.) LHWCA is the worker's compensation scheme which applies under the OCSLA. 43 U.S.C. § 1333(b). A worker's status as a borrowed servant *vel non* is determined by the Fifth Circuit's nine-factor test established in *Ruiz v. Shell Oil Co.*, 413 F.2d 310 (5th Cir. 1969). (Doc. 37-1 at 7.)

According to Equinor, the *Ruiz* factors are applied "differently depending on the two different contexts in which the inquiry arises." (*Id*. (citing *Gaudet v. Exxon Corp.*, 562 F.2d 351, 356 (5th Cir. 1977)).) When determining whether to extend LHWCA immunity to an alleged borrowing employer, "the Fifth Circuit in *Gaudet* distilled the borrowed-employee factors into a two-pronged framework:

> (1) was the second employer itself responsible for the working conditions experienced by the employee, and the risks inherent therein and, (2) was the employment with the new employer of such duration that the employee could be reasonably presumed to have evaluated the risks of the work situation and acquiesced thereto.

3

(*Id.* at 7–8 (quoting *Gaudet*, 562 F.2d at 357).)

Even so, Equinor maintains that "each of the *Ruiz* factors, and especially those emphasized in *Gaudet*" favor Equinor's Motion. (*Id.* at 8.) As to each factor, Equinor argues the following.

### 1. Control

As to the first *Ruiz* factor, "who has control over the employee and the work he is performing . . ., Equinor directed Plaintiff's work on the Titan." (*Id.* at 8–9.) Equinor concedes that "Plaintiff may have been able to complete his specialized electrical work without Equinor looking over his shoulder" but argues that this "is immaterial to the 'control' issue in this context." (*Id.* at 10 (citing *Robertson v. W&T Offshore, Inc.*, 712 F. Supp. 2d 515, 529–30 (W.D. La. 2010)).) Equinor maintains that Plaintiff had no Danos supervisor on the Titan as he contacted his shore-based Danos account manager supervisor a maximum of "twice a hitch." (*Id.* at 9.) Plaintiff got his specific work assignments from Equinor at his Equinor email address by way of an automated system. (*Id.* at 10.) Plaintiff was required to get a safe work permit (JSA) from Equinor before he did the work, and for the grocery unloading being done at the time of the accident, he worked next to and under the supervision of Equinor employees. (*Id.* at 10–11.)

### 2. Whose Work Was Being Performed

Here, Equinor argues that there is "no doubt" this factor favors Equinor since the work being performed by Plaintiff as an electronic technician on Equinor's platform was Equinor's alone. (*Id.* at 11.)

### 3. Meeting of the Minds re Plaintiff's Work

According to Equinor, the contract between Danos and Equinor called for Danos to provide "skilled . . . technicians" who would "perform their duties on [the Titan] and under the direction and supervision of the Platform leadership." (*Id.* at 12 (citing Ex. 1A, Equinor/Danos MSA, Doc.

37-4 at 7, "Introduction" (emphasis omitted)); Ex. 1A, Equinor/Danos MSA, Doc. 37-4 at 8–9,

"General Personnel Requirements and Expectations".) Thus, Equinor maintains this factor favors

its Motion.

### 4.    Acquiescence by Plaintiff in His Work Arrangement

Because Plaintiff had worked exclusively for Equinor on the Titan for two and a half years

and took his daily work assignments from Equinor, this factor, says Equinor, is easily satisfied and

strongly favors borrowed employee status. (Doc. 37-1 at 13.)

### 5.    Relinquishment of Control

The fifth *Ruiz* factor asks whether the original employer terminated his relationship with

the employee. *See Ruiz*, 413 F.2d at 313. According to Equinor, despite this factor's use of the

word "termination," there is no requirement that the original employer (Danos) terminate the

relationship with the employee (Thibodeaux) entirely but, rather, Danos need only relinquish

control of Thibodeaux in favor of the borrowing employer. (Doc. 37-1 at 13–14) (citations

omitted).) Equinor argues that this requirement is easily met here since Plaintiff took his

assignments from Equinor, was required to follow Equinor's JSA procedures, and had very limited

contact with Danos during a typical hitch. (*Id*. at 14.)

### 6.    Provision of Workplace, Lodging, Food, and Tools

Plaintiff worked, lived, and ate exclusively on the Titan. (*Id*. at 14–15.) Equinor contends

that all but Plaintiff's small tools were provided by Equinor, and, thus, this factor favors borrowed

employee status and the granting of the Motion. (*Id*.) It is only required that the "employee's major

tools and place of employment [be] provided" to support borrowed employee status. (*Id*. at 14

(citations omitted).)

### 7. *Length of Time Worked for Borrowing Employer*

Equinor maintains that the two and a half years Plaintiff worked for Equinor on the Titan is "certainly sufficient to satisfy this factor." (*Id*. at 15.)

### 8. *Right of Discharge*

This factor, argues Equinor, does not require that the borrowing employer have the right to discharge the worker from his employment with the original employer; rather, it only requires that Equinor had the right to discharge Plaintiff from its platform. (*Id*. at 16 (citations omitted).) Equinor clearly had this right, says Equinor. (*Id*. (citing Declaration of Mark Fort, Doc. 37-3 at ¶ 20; Ex. 1A, Equinor/Danos MSA, Doc. 37-4 at 8).)

### 9. *Obligation to Pay Worker*

Equinor urges that, as long as the borrowing employer compensates the original employer for the employee's work, this factor is met. (*Id*. at 16–17 (citations omitted).) This was the case here. (*Id*. at 17 (record citations omitted).)

Thus, according to Equinor, all nine *Ruiz* factors favor Thibodeaux's status as a borrowed employee of Equinor, and summary judgment must be granted.

### B. Plaintiff

Plaintiff argues first that the borrowed servant defense is available to Equinor only if Danos failed to secure worker's compensation coverage under LHWCA. (Doc. 60 at 11 (citing 33 U.S.C. § 905(a)).) But even if the borrowed servant doctrine applies, Plaintiff argues he "was not Equinor's employee, borrowed or otherwise . . . [, but] was instead employed by . . . Danos." (*Id*. at 1.) According to Plaintiff, at least four of the nine factors militate against the borrowed employee status (the second, third, fourth and fifth), and genuine issues of fact exist as to the remaining five.

(*Id*. at 13.) As viewed from Plaintiff's perspective, the evidence on each factor shows the following.

### 1. Control

According to Plaintiff, this factor is "heavily disputed and belongs with the jury." (*Id.* at 14.) While Equinor "assigned general tasks" to Plaintiff, this is of "no consequence" since Plaintiff "did not report to anyone from Equinor" and "decided how to complete his work himself, without Equinor's input." (*Id*.) Plaintiff insists that, under these circumstances, borrowed servant status does not exist.

> As the Fifth Circuit has repeatedly stressed, "a careful distinction must be made between authoritative direction and control, and mere suggestion as to details or the necessary co-operation, where the work furnished is part of a larger undertaking. 'Co-operation,' as distinguished from 'subordination,' is not enough to create an employment relationship."

(*Id.* (quoting *Mays v. Dir., Off. of Workers' Comp. Programs*, 938 F.3d 637, 643–44 (5th Cir. 2019) (emphasis omitted)).)

Plaintiff considered Danos's account manager Matt Pierre to be his supervisor, not Equinor's Mark Fort (*Id.* (record citation omitted).) Although Plaintiff was helping move groceries at the time of the accident, this was not Plaintiff's fundamental role and does not establish Equinor's control over all of Plaintiff's duties. (*Id*. at 15.) At most, says Plaintiff, this merely establishes cooperation, not subordination. (*Id*.) Because this factor involves disputed issues of fact, it "should not . . . be[ ] taken from the jury. (*Id* (quoting *Brown v. Union Oil Co. of Cal.*, 984 F.2d 674, 677 (5th Cir. 1993)).)

### 2. Whose Work Was Being Performed

As to this factor, Plaintiff argues that "courts generally look at whose work was being performed at the time of the accident." (*Id*. at 16 (citing *Jorge-Chavelas v. La. Farm Bureau Cas.*

*Ins. Co.*, 307 F. Supp. 3d 535, 555 (M.D. La. 2018), *aff'd*, 917 F.3d 847 (5th Cir. 2019)).) Here, says Plaintiff, his work "carrying groceries [was] for himself, for Premier, and for other independent contractors on the platform." (*Id*. at 16–17.) This factor militates against borrowed servant status.

### 3.  *Meeting of the Minds re Plaintiff's Work*

Plaintiff argues that the parties agreed that Danos would at all times be Plaintiff's employer and expressly assigned Danos typical responsibilities as such. (*Id*. at 17; *see also id*. at 5–6.) Plaintiff points first to Section 2.1.2 of the MSA:

> Contractor shall perform and execute the provisions of the Contract at all times as an independent contractor, and no member of the Contractor Group shall be, represent, act or purport to be deemed for any purpose to be an agent, servant, representative, or employee of Company nor shall any member of Contractor Group be treated as an employee of Company for any purpose . . . . [Danos] shall have full legal charge and control of its subcontractors, employees, agents and equipment engaged in the performance of the Work.

(*Id.* at 5 (quoting MSA, Doc. 54-3 at 65).)[3]

Plaintiff also points the Court to what it characterizes as "a plethora of traditional employer responsibilities" retained by Danos in the MSA. (*Id*. at 17–18 (record citations omitted).) With such contract language present in the MSA, there is "an issue of fact as to the third factor, such that summary judgment would be appropriate only when the remaining factors clearly point to borrowed-employee status." (*Id*. at 19 (quoting *Washington v. Fieldwood Energy LLC*, 275 F. Supp. 3d 767, 774 (E.D. La. 2017) (internal quotations and citations omitted)).) Plaintiff insists these provisions weigh heavily against borrowed servant status. (*Id.*)

---

[3] In the Definitions section of the MSA, "Company" is defined to mean Equinor, and "Contractor" means Danos. (MSA, Doc. 54-3 at 61.)

### 4. *Acquiescence by Plaintiff in His Work Arrangement*

Plaintiff disputes Equinor's argument that his two years on the Titan satisfies this factor since it "ignores [the] reality" that Plaintiff "understood that . . . he was employed by Danos." (*Id.* (record citations omitted).) Indeed, because "[n]othing remotely suggests that [Plaintiff's] relationship and communication with Danos ever ceased[,]" this factor weighs against borrowed servant status. (*Id.* at 20.)

### 5. *Relinquishment of Control*

Plaintiff argues that the Fifth Circuit asks two questions to determine whether this factor has been met: (1) whether there was any supervision by the original employer; and (2) whether the employee had any contact with his original employer. (*Id.* at 20 (citing *Hotard v. v. Devon Energy Prod., L.P.*, 308 F. App'x 739, 742 (5th Cir. 2009); *In re Weeks Marine*, 88 F. Supp. 3d 593, 600 (M.D. La. 2015)).) By this measure, issues of fact preclude summary judgment on this issue since Plaintiff "would talk to . . . his Danos supervisor regularly." (*Id.* (record citation omitted).)

### 6. *Provision of Workplace, Lodging, Food, and Tools*

According to Plaintiff, "Danos and Equinor both provided [Plaintiff] with tools and equipment required for the job . . . ." (*Id.* at 21.) While Plaintiff concedes that "Equinor provided . . . food, lodging[,] and transportation[,]" he argues that this "does not change that [Plaintiff] was still an independent contractor" but "merely reflects . . . that [Plaintiff] would be far offshore." (*Id.*)

### 7. *Length of Time Worked for Borrowing Employer*

Because the Fifth Circuit has declared " 'it is debatable whether approximately ***a year and a half*** is a "considerable" length of time' " for purposes of measuring this factor; "[t]hat means that it is also debatable whether two and a half years could be deemed 'considerable.' " (*Id.* at 22

(quoting *U.S. Fire Ins. Co. v. Miller*, 381 F.3d 385, 390 (5th Cir. 2004)) (emphasis added by Plaintiff).) Thus, the Court should find that there is a question of fact as to this factor.

### 8.   *Right of Discharge*

Plaintiff concedes that this factor turns on whether Equinor had the right to terminate Plaintiff's services with Equinor (not with Danos) but still maintains that there "remains ambiguity" as to this factor. (*Id.*) Based on Plaintiff's view of the language of the MSA, Equinor could not remove Plaintiff from the platform. (*Id.* at 23.) Rather, if Equinor was unhappy with Plaintiff's work, its "only recourse would be to terminate the entire contract with Danos – which weighs against the borrowed employee status." (*Id.* (citing *Jorge-Chavelas*, 307 F. Supp. 3d at 561).)

### 9.   *Obligation to Pay Worker*

Here, Plaintiff argues that since Danos had the obligation to pay Plaintiff (deducting for federal and state taxes and paying for other employee benefits), this factor militates against borrowed employee status. (*Id.* (record citations omitted).)

### C.  Equinor's Reply

According to Equinor, Plaintiff's contention that because Danos secured LHWCA compensation coverage for Plaintiff this eliminates Equinor's immunity from tort suit under section 905(a) is unsupported and, indeed, contradicted by Fifth Circuit case law. (Doc. 61 at 1–2 (citing, *inter alia*, *West v. Kerr-McGee Corp.*, 765 F.2d 526, 530 (5th Cir. 1985)).) As to the nine *Ruiz* factors generally, Equinor maintains that the so-called fact issues raised by Plaintiff are, at best, immaterial to the application of the factors and, therefore, do not alter the analysis. (*Id.* at 2.)

As to the control factor, for instance, while Plaintiff argues he considered Danos employee Matthew Pierre to be his supervisor, Plaintiff denied receiving supervision from him. (*Id.* at 4

(record citations omitted).) Equinor argues that the jurisprudence relied on by Plaintiff is distinguishable. (*Id*. at 4–5.) As to Plaintiff's argument that, despite being under Equinor's supervision for the grocery offloading task, he was not under Equinor's supervision for all his work assignments, Equinor points the Court to *Melancon*, where a welder doing specialized work was nonetheless found to be under the control of the platform owner. (*Id*. at 5 (citing *Melancon v. Amoco Prod. Co*., 834 F.2d 1238, 1245 (5th Cir. 1988)).)

Equinor counters Plaintiff's claim that the Court should focus on his duties at the time of the accident (the grocery box unloading) by pointing the Court to its decision in *In re Weeks Marine, Inc*., where the Court stated, "In deciding whose work was being performed, the [*Melancon*] court looked not to the specific task he was doing at the time of the accident but the role he played generally in carrying out his duties and its furtherance of Amoco's business on the platform." (*Id.* at 6 (citing *In re Weeks Marine, Inc*., 88 F. Supp. 3d at 598).)

Regarding the MSA and alleged meeting of the minds between Danos and Equinor, Equinor argues again that provisions in the MSA "cannot automatically prevent" the existence of borrowed servant status. (*Id.* (citation omitted).) It also reiterates its position that the two and a half years Plaintiff worked on the Titan more than satisfies Plaintiff's acquiescence in his work arrangement on the Titan. (*Id*. at 7.)

Equinor largely repeats its arguments regarding Danos's relinquishment of control, (*id*. at 7–8), and its furnishing of Plaintiff's workplace, lodging, food, and tools, (*id*. at 8). As to whether Plaintiff worked on the Titan for a "considerable length of time," Equinor cites *Raicevic v. Fieldwood Energy, L.L.C.*, 979 F.3d 1027 (5th Cir. 2020), where the court found that "in the LHWCA context, one year seems long enough to accept the risks of the job and consent to the

statutory trade-off of receiving benefits in lieu of the possibility of winning a tort suit." (Doc. 61 at 8 (citing *Raicevic*, 979 F.3d at 1033).)

Equinor disagrees with Plaintiff's contention that the only way to terminate Plaintiff's employment would be to terminate the entire contract with Danos. (*Id*. at 8–9.) Instead, it points the Court to specific provisions of the MSA giving Equinor the right to approve who works on its platform and the right to replace Danos personnel. (*Id*. (citing Doc. 37-4 at 68, §§ 2.5.3, 2.6.4).) As to the final factor, the obligation to pay the worker, Equinor again argues that the Court must look to who furnishes the funds from which the worker is paid, not who issues his paycheck. (*Id*. at 9 (citation omitted).)

## III.    SUMMARY OF ARGUMENTS OF THE PARTIES – EQUINOR'S ALLEGED NEGLIGENCE

### A.    Equinor

Equinor contends that even if Plaintiff is not its borrowed employee, it is still entitled to summary judgment because it "was not negligent as a matter of law. To the extent there was something improper about how the grocery box was loaded, that is not Equinor's responsibility under Fifth Circuit precedent." (Doc. 37-1 at 2.)

As a threshold matter, argues Equinor, it owed no "duty of protecting against the hazard of a box handle tearing as a result of the box allegedly being loaded improperly by Acadia at its warehouse in Church Point." (*Id*. at 18.) Its duty does not require it to intervene and correct the work practices of its independent contractor Acadia. (*Id*. at 18–19 (citations omitted).) "**Plaintiff fails to present any evidence suggesting that Equinor created the hazard of the box handle tearing**." (*Id*. at 19 (emphasis by Equinor).) Even though Plaintiff's experts "point out additional measures Equinor could have taken" to have prevented the accident, these are of no legal moment

12

since it "had no legal obligation to implement alternative measures to protect against box handles tearing." (*Id*. at 20.)

Equinor argues that the factual issue over the weight of the box is a red herring since "Equinor is not legally responsible for the weight of the cardboard boxes . . . ." (*Id*.) In any event, however, "all of the evidence indicates that the box at issue weighed under 55 pounds." (*Id*. at 21 (record citations omitted).) To the extent Plaintiff is arguing that Equinor's unloading procedures were defective because they required Plaintiff to twist his back, this likewise is a red herring since Plaintiff testified that he did not twist his back during normal transfer of boxes but only did so after the box handle tore. (*Id*. at 22.)

Equinor also maintains that Plaintiff cannot prove that any possible fault on its part was a legal cause of the accident since the allegedly defective box of groceries came from a third party for whom it had no responsibility. (*Id*. at 23.) Finally, as a matter of fact, the record evidence shows that Equinor acted with due and reasonable care in providing safe lifting practices, proper training, and a reasonably safe working environment. (*Id*. at 24.)

### B. Plaintiff

Plaintiff argues that Equinor has misstated his negligence claims against it, "suggesting the claims [are] identical to Plaintiff's claims against Acadia," when, in fact, they are not. (Doc. 60 at 25.) Plaintiff is not arguing that Equinor is responsible for faulty packaging. Rather, Equinor failed to follow its own policies and procedures in the development of JSAs and in the execution of tasks. (*Id*. at 26) Further, "Equinor failed to implement simple controls that could have prevented [Plaintiff] from making the unsafe lift by identifying heavy boxes, using lifting tools, and using multiple people when lifting over 55 pounds as required by Equinor's own document, Lifting

Safety (WR2853)." (*Id.* at 26–27.) This view, says Plaintiff, is supported by Plaintiff's expert Gerald S. Nielson.[4] (*Id.* (citing Doc. 54-12 at 17); *see also* PAF, Doc. 53-1 at ¶¶ 34, 37–40.)

Plaintiff's other expert opines separately that "Equinor failed to provide [Plaintiff] with a reasonable safety and health program that dealt with ergonomic issues that met standard industry work practices." (*Id.* at 27 (citing Andres Report, Doc. 54-10 at 17).) Thus, concludes Plaintiff, "summary judgment is unwarranted because a question of fact exists as to whether Equinor created a hazard that resulted" in Plaintiff's injuries. (*Id.*) On the issue of causation, Plaintiff claims there are questions of fact which preclude summary judgment. (*Id.* at 28–29.)

### C.  Equinor's Reply

Equinor reiterates its argument that it owed no duty to protect Plaintiff against a box handle tearing and argues that Plaintiff fails to address this "simple yet powerful argument." (Doc. 61 at 9–10.) It disputes Plaintiff's contention that it owed a general duty to exercise due care because the scope of that duty did not include the risk that a box loaded by a third party would tear. (*Id.* at 10.) That Equinor owed no such duty also demonstrates Plaintiff's failure to show that any possible breach of a duty owed to Plaintiff was a legal cause of his injury. (*Id.* at 10–11.)

According to Equinor, Plaintiff's argument that Equinor should have initiated extra safety measures fails because he provides no evidence that Equinor knew or should have known of the risk of the box handle tearing. (*Id.* at 12.) The same is true of Plaintiff's other "unsupported, unpersuasive claims" that Equinor should have identified heavy boxes, used lifting tools, or used multiple people in lifting loads over 55 pounds. (*Id.* at 13–14.)

---

[4] Equinor has filed motions in limine to exclude or limit the testimony of Plaintiff's experts Nielsen and Dr. Robert Andres, (Docs. 43 and 42 respectively), which are under consideration.

## IV.    STANDARD FOR MOTION FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

## V.    STANDARD RE DETERMINING BORROWED SERVANT STATUS

To resolve a borrowed servant issue arising on a fixed platform on the OCS where LHWCA is implicated, the Fifth Circuit has consistently followed the nine-part test set out in *Ruiz v. Shell Oil Co.*, 413 F.2d 310 (5th Cir. 1969).

> To determine whether an employee is a "borrowed employee," we consider the nine factors articulated in *Ruiz v. Shell Oil Company*:
>
> 1. Who had control over the employee and the work he was performing, beyond mere suggestion of details or cooperation?

2. Whose work was being performed?

3. Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

4. Did the employee acquiesce in the new work situation?

5. Did the original employer terminate his relationship with the employee?

6. Who furnished tools and place for performance?

7. Was the new employment over a considerable length of time?

8. Who had the right to discharge the employee?

9. Who had the obligation to pay the employee?

*Raicevic v. Fieldwood Energy, L.L.C.*, 979 F.3d 1027, 1031 (5th Cir. 2020) (citing *Ruiz*, 413 F.2d 310; *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1244 (5th Cir. 1988)).

Although no single one of these factors is decisive, the first is the most critical. "As we have stated, '[t]he central question in borrowed servant cases is whether someone has the power to control and direct another person in the performance of his work.' " *Mays v. Dir., Off. of Workers' Comp. Programs*, 938 F.3d 637, 642 (5th Cir. 2019) (quoting *Hebron v. Union Oil Co. of Cal.*, 634 F.2d 245, 247 (5th Cir. 1981) (per curiam) (citing *Gaudet v. Exxon Corp.*, 562 F.2d 351, 355 (5th Cir. 1977))).

The court in *Raicevic* made several important points regarding the application of the *Ruiz* factors. First, although "[t]hese nine factual inquiries underlie borrowed-employee status, [ ] the ultimate determination of whether an employee is a borrowed employee is a question of law for the court to decide." *Raicevic*, 979 F.3d at 1031.[5] Second, the *Raicevic* court recognized that

---

[5] While this statement is frequently repeated in the Fifth Circuit's borrowed servant jurisprudence, "some cases involve factual disputes on the issue of borrowed employee status and require findings by a fact-finder. *Hewitt v. W&T Offshore, Inc.*, No. 22-461, 2023 WL 2475694, at *7 (E.D. La. Mar. 13, 2023) (citing *Melancon*, 834 F.2d at 1244–

"[d]etermining borrowed-employee status . . . is a complex question of law." *Id.* Third, "in different cases, [ ] certain of these factors may be more important than others, at least in the light of the facts [ ] before the court." *Id.* (citing *Alday*, 750 F.2d at 376).

## VI.    DISCUSSION RE BORROWED SERVANT

Each of the nine *Ruiz* factors will be discussed in turn.

### A.  Who had control of Thibodeaux's work?

While Equinor concedes that "Plaintiff may have been able to complete his specialized electrical work without Equinor looking over his shoulder," it argues that this "is immaterial to the 'control' issue in this context." (Doc. 37-1 at 10 (citing *Robertson v. W&T Offshore, Inc.*, 712 F. Supp. 2d 515, 529–30 (W.D. La. 2010)).) Equinor insists that Plaintiff had no Danos supervisor on the Titan and he contacted his shore-based Danos account manager supervisor a maximum of twice a hitch. (*Id.* at 9.) Plaintiff got his specific work assignments at his Equinor email address by way of an automated system. (*Id.* at 10.) Plaintiff was required to get a safe work permit (JSA) from Equinor before he did the work and, for the grocery unloading being done at the time of the accident, he worked next to and under the supervision of Equinor employees. (*Id.* at 10–11.)

On the other hand, Plaintiff insists that, while Equinor "assigned general tasks" to Plaintiff, this is of "no consequence" since Plaintiff "did not report to anyone from Equinor" and "decided how to complete his work himself without Equinor's input." (Doc. 60 at 14 (record citations omitted).) Plaintiff argues that borrowed servant status does not exist under these circumstances. Although infrequently, Plaintiff did maintain regular contact with his Danos supervisor. He did not consider Eqinunor's Mark Fort to be his supervisor. (*Id.* (record citation omitted).) Although

---

45, and discussing two Fifth Circuit cases reversing grants of summary judgment on the borrowed servant question because of factual issues—*Brown v. Union Oil Co. of California*, 984 F.2d 674, 676 (5th Cir. 1993) and *Alday v. Patterson Truck Line Inc.*, 750 F.2d 375 (5th Cir. 1985)).

Plaintiff was helping move groceries at the time of the accident, this was not Plaintiff's fundamental role and does not establish Equinor's control over all of Plaintiff's duties. (*Id.* at 15.) At most, says Plaintiff, this merely establishes cooperation, not subordination. (*Id.*)

Equinor replies that it does not matter that Plaintiff considered Danos employee Matthew Pierre to be his supervisor since he denied receiving supervision from him. (Doc. 61 at 4 (record citations omitted).) Equinor argues that the jurisprudence relied on by Plaintiff is distinguishable. (*Id.* at 4–5.) As to Plaintiff's argument that, despite being under Equinor's supervision for the grocery offloading task, he was not under Equinor's supervision for all his work assignments, Equinor points the Court to *Melancon*, where a welder doing specialized work was nonetheless found to be under the control of the platform owner. (*Id.* at 5 (citing 834 F.2d at 1245).)

The Court has carefully considered the evidence on this point and finds it to be conflicting but leaning strongly in favor of the conclusion that Equinor did not control Thibodeaux's work in the sense intended by this factor. While Thibodeaux did receive his work assignments on the Titan from Equinor via Equinor's automated email system, *how* he did his jobs was left entirely to him. (Doc. 54-2 at 257–58.)

> Q.    You testified that the OIM is the big dog [on the platform.] Do you
>       remember saying that?
>
> A.    Yes.
>
> Q.    Would the OIM ever tell you how to do your job?
>
> A.    No.
>
> Q.    Would he give you job steps?
>
> A.    No.
>
> Q.    Would he give you instructions as to the order in which you needed
>       to complete tasks?

A.      No.

Q.      *Did you make all your own decisions for those things?*

A.      *Yes.*

Q.      Were you ever working under the direction or direct supervisor [sic]
of the OIM?

A.      No

(*Id.* (emphasis added).)

The Court finds that Thibodeaux's work situation was similar to that of the worker in *Mays v. Director, Office of Workers' Compensation Programs*, 938 F.3d 637, 643–44 (5th Cir. 2019) whose borrowed servant status was at issue.

> As we have long noted, "a careful distinction must be made 'between authoritative direction and control, and mere suggestion as to details or the necessary co-operation, where the work furnished is part of a larger undertaking.' " " ' Co-operation,' as distinguished from 'subordination,' is not enough to create an employment relationship." Here, the facts indicate that although Avondale monitored the sandblasting project it had hired IMIA to complete, Avondale did not direct the actions of IMIA employees during the course of their daily work. Some degree of oversight is a necessary component of any contract relationship; it is never the case that an independent contractor "simply appear[s]" at a job site and does "whatever it want[s]." Avondale's quality checks and general site management are readily distinguished from the conduct of a borrowing employer, who gives direct orders to its borrowed servant.

*Mays*, 938 F.3d at 643–44.

As is discussed in more detail later, the conflicting evidence on this point is especially important when viewed in connection with the language of the MSA dictating that Danos's employees were not to be considered "for any purpose [ ] an agent, servant, representative, or employee of [Equinor] for any purpose….[,][and Danos] shall have full legal charge and control of its subcontractors, employees, agents[,] and equipment engaged in the performance of the

19

Work." (Doc. 60 at 5 (citing MSA, Doc. 54-3 at 65).) *See Hewitt v. W&T Offshore, Inc.*, No. 22-461, 2023, --- F. Supp. 3d. ---, WL 2475694, at \*8–9 (E.D. La. Mar. 13, 2023); *Washington v. Fieldwood Energy LLC*, 275 F. Supp. 3d 767, 774 (E.D. La. 2017), *on reconsideration*, No. 15-6615, 2018 WL 263230 (E.D. La. Jan. 2, 2018); *Parkman v. W&T Offshore, Inc.*, No. 20-883, --- F. Supp. 3d ---, 2023 WL 4288439, at \*13–15 (M.D. La. June 2, 2023) (deGravelles, J.).

### B. Whose work was being performed?

Whether one focuses on the work Plaintiff performed generally on the platform or the specific job he was doing at the time of the accident, that work was Equinor's. This factor weighs in favor of Equinor and borrowed employee status.

### C. Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

Here, the parties direct the Court to different provisions of the MSA contract. Equinor points to the contract's Introduction calling for Danos to provide "skilled technicians" who would "perform their duties on [the Titan] and under the direction and supervision of the Platform leadership." (Doc. 37-1 at 12–13 (citing Ex. 1A, Equinor/Danos MSA, Doc. 37-4 at 7, "Introduction" (emphasis omitted)); *see also* Ex. 1A, Equinor/Danos MSA, Doc. 37-4 at 8–9, "General Personnel Requirements and Expectations".)

Plaintiff, on the other hand, emphasizes Section 2.1.2 of the MSA:

> [Danos] shall perform and execute the provisions of the Contract at all times as an independent contractor, and no member of the [Danos] Group shall be, represent, act[,] or purport to be deemed for any purpose to be an agent, servant, representative, or employee of [Equinor] for any purpose. . . . [Danos] shall have full legal charge and control of its subcontractors, employees, agents[,] and equipment engaged in the performance of the Work.

(Doc. 54-3 at 65.)

Plaintiff also argues that other provisions in the contract call for Danos to assume "traditional employer responsibilities." (Doc. 60 at 17–18 (citing Doc. 54-3 at 3, 4, 10, 30–33, 36, and 42).)

The Court has reviewed the MSA and finds that, while the language in the Introduction creates some ambiguity, based on the clear and emphatic language in Section 2.1.2 coupled with the other specific responsibilities given to Danos, (Doc. 54-3 at, 3, 4, 10, 30–33, 36, and 42), this factor is mixed but strongly leans in favor of Thibodeaux's position that he was not a borrowed employee.

Therefore, the question for the Court here is whether the *Ruiz* factors other than the agreement between Equinor and Danos in Section 2.1.2 of the MSA "clearly point to borrowed-employee status." *Billizon v. Conoco*, 993 F.2d 104, 106 (5th Cir. 1993). Or, to use the language from *Brown*, do the "remaining factors [ ] overwhelmingly show that [Thibodeaux] was a borrowed employee . . . [?]" *Brown*, 984 F.2d at 679. If so, summary judgment is warranted despite the MSA provision. If not, summary judgment must be denied.

### D.  Did the employee acquiesce in the new work situation?

Here, the inquiry considers whether the employee was aware of his work conditions and chose to continue working in them. The uncontradicted testimony is that Plaintiff worked on the Titan without interruption for two and a half years and, therefore, knew "what his work conditions would be." *Melancon*, 834 F.2d at 1246. No evidence has been presented that Thibodeaux complained to anyone regarding his work conditions.

But this factor also "should focus on the lending employer's relationship with the employee while the borrowing occurs." *Id.* (quoting *Capps v. N.L. Baroid-N.L. Indus., Inc.*, 784 F.2d 615, 619 (5th Cir. 1986)) (internal quotations omitted). Here, the evidence is more mixed. Thibodeaux

testified that he maintained regular (though relatively infrequent) contact with Danos supervisor Matt Pierre, whom he considered to be his supervisor. (Doc. 54-2 at 103–04 (contacting Pierre "twice a hitch").) But Thibodeaux testified that he did not get supervision from Pierre. (*Id*. (He was "able to do all the work [him]self without any input from Danos, the shore-side guy.").)

While Plaintiff argues that he continued to be employed by Danos while working on the Titan, (Doc. 60 at 19–20), this alone is of no significance in weighing this factor since "[t]his factor does not require a lending employer to sever completely its relationship with the employee, because such a requirement would effectively eliminate the 'borrowed employee' doctrine." *Melancon*, 834 F.2d at 1246 (citing *Capps*, 784 F.2d at 617–18).

While the evidence on this issue is mixed, the Court finds that it leans in favor of Thibodeaux's borrowed servant status.

**E.   Did the original employer terminate his relationship with the employee?**

Equinor maintains there is no requirement that Danos terminate the relationship entirely to meet this factor but, rather, there must be a relinquishment of control in favor of the borrowing employer. (Doc. 37-1 at 13–14 (citations omitted).) Equinor argues that this requirement is easily met since Plaintiff took his assignments from Equinor, was required to follow Equinor's JSA procedures, and had very limited contact with Danos during a typical hitch. (*Id*. at 14.)

Plaintiff argues that the Fifth Circuit test for this factor centers on the answer to two questions: (1) whether there was any supervision by the original employer; and (2) whether the employee had any contact with his original employer. (Doc. 53 at 25–26 (citing *Hotard v. Devon Energy Prod., L.P*., 308 F. App'x 739, 742 (5th Cir. 2009); *In re Weeks Marine*, 88 F. Supp. 3d 593, 600 (M.D. La. 2015)).) By this measure, issues of fact preclude summary judgment on this issue since Plaintiff "would talk to . . . his Danos supervisor regularly." (*Id*. at 26.)

As mentioned above, Thibodeaux did maintain regular contact with his Danos supervisor but did not receive supervision or direction from him. It is true that the cases cited by Plaintiff (*Hotard* and *In re Weeks*) do consider mere contact, even in the absence of supervision, in weighing this factor. However, actual direction and supervision is more important. While the evidence is mixed, this factor on balance favors Thibodeaux's status as a borrowed employee of Equinor.

### F.   Who furnished tools and place for performance?

Plaintiff worked, lived, and ate exclusively on the Titan. Equinor contends that all but Plaintiff's small tools were provided by Equinor, and, thus, this factor favors the granting of the Motion. (Doc. 37-1 at 14–15.) Plaintiff concedes that Equinor provided food, lodging, and transportation but maintains that tools were provided by both Danos and Equinor. (Doc. 60 at 21.) On balance, this factor favors Equinor's position that Thibodeaux was its borrowed employee.

### G.   Was the new employment over a considerable length of time?

Equinor maintains that the two and a half years Plaintiff worked for Equinor on the Titan is "certainly sufficient to satisfy this factor." (Doc. 37-1 at 15–16.) Plaintiff counters that, because the Fifth Circuit has declared " 'it is debatable whether approximately ***a year and a half*** is a "considerable" length of time' for purposes of measuring this factor . . .[,] [t]hat means that it is also debatable whether two and a half years could be deemed 'considerable.' " (Doc. 60 at 22 (quoting *U.S. Fire Ins. Co. v. Miller*, 381 F.3d 385, 390 (5th Cir. 2004)) (emphasis added by Plaintiff).) Thus, the Court should find that there is a question of fact as to this factor.

After reviewing the evidence, the Court finds that this factor clearly favors borrowed employee status.

### H.  Who has the right to discharge the employee?

This factor, argues Equinor, does not require the borrowing employer have the right to discharge the worker from his employment with the original employer; rather, it only requires that Equinor had the right to discharge Plaintiff from its platform. (*Id.* at 16 (citations omitted).) Equinor clearly had this right. (*Id.* (record citations omitted); *see also* Doc. 61 at 8–9 (citing MSA, Doc. 37-4, at 18–19, 25, 47; Declaration of Mark Fort, Doc. 37-3 at ¶ 8).)

Plaintiff concedes that this factor turns on whether Equinor had the right to terminate Plaintiff's services with Equinor but still maintains that there "remains ambiguity" as to this factor. (Doc. 60 at 22.) Based on Plaintiff's view of the language of the MSA, Equinor could not remove Plaintiff from the platform. Rather, if Equinor was unhappy with Plaintiff's work, its "only recourse would be to terminate the entire contract with Danos – which weighs against the borrowed employee status." (*Id.* at 23 (citing *Jorge-Chavelas v. La. Farm Bureau Cas. Ins. Co.*, 307 F. Supp. 3d 535, 561 (M.D. La. 2018), *aff'd*, 917 F.3d 847 (5th Cir. 2019)).)

The Court has carefully examined the evidence on this point and concludes that it favors Thibodeaux's borrowed employee status.

### I.  Who had the obligation to pay the employee?

Equinor urges that, as long as the borrowing employer compensates the original employer for the employee's work, this factor is met. (Doc. 37-1 at 16–17 (citations omitted).) This was the case here. (*Id.* at 17 (record citations omitted).) Plaintiff argues that because Danos had the obligation to pay Plaintiff (deducting for federal and state taxes and paying for other employee benefits), this factor militates against borrowed employee status. (Doc. 60 at 23.)

This factor favors Equinor's position. *In re Weeks Marine, Inc.*, 88 F. Supp. 3d at 600 ("[T]he proper test for this factor is who furnished the funds to pay the employee.") (citing *Capps*,

784 F.2d at 618; *Melancon*, 834 F.2d at 1246; *Fairley v. Murphy Expl. & Prod. Co.*, 58 F. Supp. 3d 641, 645 (E.D. La. 2014)).

### J.  Conclusion on Borrowed Servant Issue

Of the nine *Ruiz* factors, four favor Equinor, three have conflicting evidence but overall lean in favor of Equinor, and two have mixed evidence but lean in favor of Thibodeaux. However, the presence of language in the MSA contract between Equinor and Danos purporting to dictate Thibodeaux's status as an employee of Danos (Section 2.1.2) affects the analysis of the *Ruiz* factors. In *Parkman v. W&T Offshore, Inc.*, No. 20-883, --- F. Supp. 3d ---, 2023 WL 4288439, at *13–15 (M.D. La. June 2, 2023) (deGravelles, J.), this Court recently had occasion to consider how that analysis is affected.

> The Fifth Circuit has previously considered the role of contract language which attempts to control the borrowed employee status of the worker and the relative weight to be given to it in evaluating the *Ruiz* factors. In *Melancon*, the contract between the owner/operator of a production platform on the OCS and its contractor specified that the "no [contractor's] employee is to be considered the agent, servant, or representative of [the owner/operator]." 834 F.2d at 1245. The court wrote that "[o]bviously parties to a contract cannot automatically prevent a legal status like 'borrowed employee' from arising merely by saying in a provision in their contract that it cannot arise." *Id*. Indeed, "[t]he reality at the worksite and the parties' actions in carrying out a contract [ ] can impliedly modify, alter, or waive express contract provisions." *Id*.

> The issue was again discussed in *Brown v. Union Oil Co. of California*, 984 F.2d 674 (5th Cir. 1993). Where such a contract provision "purports to prohibit [an employee's] borrowed employee status.... [,] [s]uch contract provision [ ] does not automatically prevent borrowed employee status from arising. The parties' actions in carrying out the contract can impliedly modify or waive the express provision." *Brown*, 984 F.2d at 677–78 (internal citations omitted).

> But the court in *Brown* also noted that "[w]hether the parties had an understanding that modified the contract may raise disputed factual

issues." *Id*. at 678 (citation omitted). In reversing the district court's directed verdict on borrowed servant status, the court held that because "the contract provision between the two employers weighs against borrowed employee status, and the remaining factors do not overwhelmingly show that Brown was a borrowed employee.... [i]mportant factual questions need to be resolved." *Id*. at 679. Thus, the court remanded to the lower court.

Similarly, in *Alday*, the "contract contained ... provisions attempting to negate any borrowed employee relationship." 750 F.2d at 377. However, "despite [a] factual showing supporting an inference of [the defendant's] control of [the plaintiff,]" the Fifth Circuit found that the contract created a sufficient factual issue to warrant reversal of the district court's grant of summary judgment. *Id*. In its brief, W&T correctly characterizes *Alday's* holding as follows: "While [contract provisions attempting to negate borrowed servant status] alone are not enough to extinguish a potential borrowed employee relationship, it is sufficient to raise a genuine issue of material fact to preclude a summary judgment ruling on the issue when coupled with conflicting witness testimony and/or conduct of the parties." (Doc. 160 at 5–6, emphasis added.)

In *Billizon*, the Fifth Circuit attempted to clarify the role of these sort of contractual provisions in the summary judgment analysis. 993 F.2d 104. There, the court stated,

> The question in this case is whether the existence of a contract provision purporting to prohibit borrowed-employee status makes the district court's summary judgment inappropriate, given that such a contract provision could create a factual dispute on the third factor if the other factors were disregarded. Previously faced with this issue, this court has concluded that summary judgment is appropriate *when the remaining factors clearly point to borrowed-employee status*. See *Brown*, 984 F.2d at 678 n. 5; *Alexander v. Chevron, U.S.A*., 806 F.2d 526, 529 (5th Cir. 1986) (citing *Gaudet v. Exxon Corp*., 562 F.2d 351, 358 (5th Cir. 1977), cert. denied, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978)).

*Id*. at 106 (emphasis added).

The question for this Court is whether the *Ruiz* factors other than the contractual provisions relied on by W&T "clearly point to borrowed-employee status," *id*., or to use the language from *Brown*, do the "remaining factors [ ] overwhelmingly show that [Brubaker] was a borrowed employee ...." *Brown*, 984 F.2d at 679. If so, summary judgment is warranted despite the contract. If not, summary judgment must be denied.

\*\*\*

The recent case of *Hewitt v. W&T Offshore, Inc*. illustrates the kinds of factual disputes that would justify the denial of summary judgment in the context of contract provisions agreed to by the parties that declare that the worker is not a borrowed employee. No. 22-461, --- F.Supp.3d ---, 2023 WL 2475694 (E.D. La. Mar. 13, 2023). In *Hewitt*, the plaintiff was a mechanic employed by Pelstar Mechanical Services, LLC, who was sent to W&T's deep-water oil and gas production platform on the OCS to replace W&T's regular mechanic. *Id*. at ——, 2023 WL 2475694, at \*1. The plaintiff was working on the platform pursuant to an MSA between W&T and Pelstar which provided "it is expressly understood and agreed that [Pelstar] is an independent contractor and that neither [Pelstar] nor [Pelstar's] principals, partners, employees or subcontractors are servants, agents or employees of [W&T]." *Id*. at ——, 2023 WL 2475694, at \*9.

After reviewing *Brown*, 984 F.2d 674, *Alday*, 750 F.2d 375, and *Robertson v. Blanchard Contractors, Inc*., 2012 WL 6202988 (E.D. La. Dec. 12, 2012), the *Hewitt* court concluded that "there is conflicting evidence regarding whether the parties' conduct modified the contract provision purporting to prohibit borrowed employee status .... [including] disputes of fact regarding the control the parties exercised ...." *Hewitt*, —— F.Supp.3d at ——, 2023 WL 2475694, at \*9. Hence, summary judgment was denied.

The record evidence giving rise to the factual dispute on this issue of control included (but was not limited to) the plaintiff's testimony that, although he cooperated with other workers on the platform for the "overall function of the platform," his work as mechanic was done "independently." *Id*. at ——, 2023 WL 2475694, at \*3. He testified that he did not receive discrete instructions from W&T on how to perform his job and that W&T "did not control his work." *Id*.; see also *Washington*, 2018 WL 263230, at \*3 (denying summary judgment on borrowed servant status in the face of contract

provisions similar to the present where the court found material issues of fact as to the third *Ruiz* factor).

*Parkman*, 2023 WL 4288439, at *13–15.

Given the language in the MSA purporting to show a meeting of the minds that Danos would be considered the employer of its payroll employees working for Equinor, the question for this Court is whether the remaining *Ruiz* factors "clearly point" (*Billizon*, 933 F.2d at 106) or "overwhelmingly show" (*Brown*, 984 F.2d at 679) that Thibodeaux was a borrowed employee. If so, summary judgment is warranted despite the contract. If not, summary judgment must be denied. *Parkman*, 2023 WL 4288439, at *14.

In *Parkman*, the Court found that the remaining factors did clearly and overwhelmingly point to borrowed servant status, and summary judgment was granted on that issue. *Id.* at *15. Not so here. Of the nine factors, five have conflicting evidence including the most important factor, control (which, although mixed, leans in favor of Thibodeaux). Like the court in *Hewitt*, this Court finds that "there is conflicting evidence regarding whether the parties' conduct modified the contract provision purporting to prohibit borrowed employee status . . . [including] disputes of fact regarding the control the parties exercised . . . ." *Hewitt*, 2023 WL 2475694, at *9. Hence, summary judgment is denied on this issue.

## VII.    DISCUSSION OF EQUINOR'S ALLEGED NEGLIGENCE

Equinor argues that even if it is not the borrowing employer of Thibodeaux, it is still entitled to summary judgment on the issue of liability because first, it did not create the alleged hazards of a defective box handle or a box inordinately heavy; second, it had no legal duty or obligation to protect against such a hazard, and, therefore, any possible fault on its part could not be the legal cause of Plaintiff's injury; and third, it acted with reasonable care in providing safe

lifting practices, proper training, and a reasonably safe working environment. (Doc. 37-1 at 18–24.)

Plaintiff responds that Equinor confuses its claims against Equinor with those it is making against Acadia. As to Equinor, Plaintiff's claims—which he argues are supported by his experts—show that Equinor failed to follow its own policies and procedures in developing JSAs, and in failing "to implement simple controls that could have prevented [Plaintiff] from making the unsafe lift by identifying heavy boxes, using lifting tools, and using multiple people when lifting over 55 pounds as required by Equinor's own document Lifting Safety (WR2853)." (Doc. 60 at 26–27.)

In this case, Louisiana tort law governs the tort issues.

> Because this injury occurred on a fixed platform on the OCS, federal law applies exclusively. *Coleman*, 19 F.4th at 726 (citing *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 357, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969) (holding that "federal law is 'exclusive' in its regulation" of "artificial islands and fixed structures erected" out on the OCS (quoting OCSLA, ch. 345, sec. 4, 67 Stat. 462, 462 (1953) (codified as amended 43 U.S.C. § 1333)))). However, the tort law of the adjacent state applies as "surrogate federal law" when it is "not inconsistent with ... other Federal laws." *Id.* at 726–27 (citing *Rodrigue*, 395 U.S. at 357, 89 S.Ct. 1835 (quoting OCSLA § 4)); *Parkman v. W&T Offshore, Inc.*, 544 F. Supp. 3d 642, 648 (M.D. La. 2021) (citing, *inter alia, Cormier v. Clemco Servs. Corp.*, 48 F.3d 179, 181 (5th Cir. 1995)).

*Parkman*, No. 20-883, 2023 WL 4288488, at *8 (M.D. La. May 18, 2023).

"[I]n general, the owner or operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm. *Mundy v. Dep't of Health & Human Res*, 620 So. 2d 811, 813 (La.1993)." *Smith v. Chevron USA, Inc*., No. 98-2059, 1999 WL 615174, at *2 (E.D. La. Aug. 12, 1999). While Equinor argues it had no duty to protect against the handle of an overloaded box tearing, this

mischaracterizes the duty that Plaintiff alleges Equinor owed and breached: the duty to act with reasonable care in providing a reasonably safe workplace, including the duty to have, implement, and enforce safe lifting practices and procedures. (*See, e.g.*, Doc. 60 at 26–29.)

Although Equinor argues it acted at all times with reasonable care, including by providing safe lifting measures (Doc. 37-1 at 20, 24), the Court finds that this is a disputed fact question appropriate for resolution only by a jury. There is competent summary judgment evidence in the record that raises the issue of Equinor's negligence and whether it proximately caused Plaintiff's injuries.

It is clear that Equinor recognized that boxes weighing in excess of 55 pounds posed a risk of injury to those on its platform. For instance, the Equinor JSA relating to the operation of unloading groceries had a requirement that "there should not be lifting of boxes weighing more than 55 pounds." (Doc. 54-12 at 18 (report of Plaintiff's expert Gerald Nielsen, quoting JSA).) This requirement was consistent with a separate Equinor Lifting Safety procedure (WR2853), which stated that "[s]ingle person manual lifting may be performed for lifts under 55lbs when it is not feasible to mechanically lift." (*Id.* (citing Equinor Work Requirement WR2853, Equinor-Thibodeaux 004982-004896).)

Thibodeaux testified that his "best estimate" of the weight of the box was 60–80 pounds.[6] (Doc. 54-2 at 258. *See also id.* at 239.) In addition, Thibodeaux testified that the man who handed him the box said "heavy" as he passed it to Thibodeaux. (Doc. 41-4 at 147.) While Equinor attacks this as speculation and contrary to other evidence in the record, (Doc. 37-1 at 21–22), this estimate

---

[6] "Q. And your best estimate is that it weighed 60-80 pounds; is that correct.
   A.  Yes."
   (Doc. 54-2 at 258.)

is competent summary judgment evidence that a reasonable jury could accept and must be considered by the Court.

In addition, a reasonable inference that can be drawn from the fact that the box handles broke is that the box was overloaded and unusually heavy. (*See, e.g.*, Doc. 41-7 at 95–96 (testimony of Jeff Anthony).) A competing inference is that Plaintiff mishandled the box in some way that caused it to break. (*See, e.g.*, Doc. 29-4 at 34 (where Mark Fort testified that he had never seen an Acadia grocery box tear when people put their hands on both sides and picked them up equally).) For purposes of a motion for summary judgment, the court is required to draw all reasonable inferences in favor of the non-movant, in this case Plaintiff.

Plaintiff offers other evidence by way of the expert opinions of offshore safety expert Gerald Nielsen and ergonomics expert Robert Andres that Equinor was negligent in ways which led to the accident and injuries suffered by Thibodeaux. (Docs. 54-12 and 54-10, respectively.) Where, as here, there are questions of fact regarding whether Equinor was negligent, summary judgment is inappropriate. *Wolz v. BP Expl. & Prod., Inc*., No. 13-5112, 2015 WL 845958, at *5 (E.D. La. Feb. 25, 2015) ("[W]hether a defendant breached that duty is a question of fact." (citing *Smith*, 1999 WL 615174, at *3)).

As to Equinor's contention that it was not negligent because it did not create the alleged hazard of an overloaded box with a defective handle, (Doc 37-1 at 19), the Court rejects this argument as a straw man, since Plaintiff does not allege that Equinor was responsible for either. (Doc. 60 at 25.)

Equinor also contends that any duty it may have had in this case did not, indeed could not, have included protecting against the risk of the handle of an allegedly overloaded grocery box tearing, and, therefore, any alleged fault it might have could not be the legal cause of Thibodeaux's

accident. (Doc. 37-1 at 23.) In *Tredick v. Ekugbere*, No. 17-103, 2018 WL 5504157, at *4 (M.D. La. Oct. 29, 2018), this Court considered the circumstances in which summary judgment may properly be granted on the issue of legal cause.

> As to the fourth element, "[t]here is no 'rule' for determining the scope of the duty. Regardless if stated in terms of proximate cause, legal cause, or duty, the scope of the duty inquiry is ultimately a question of policy[.]" *Roberts* [*v. Benoit*, 605 So. 2d 1032, 1052 (La. 1991), on reh'g (May 28, 1992)]. "The essence of the [legal cause] inquiry is whether the risk and harm encountered by the plaintiff fall within the scope of protection of the [duty]." *Id*. at 1054 (quoting *Dixie Drive It Yourself Sys. New Orleans Co. v. Am. Beverage Co.*, 242 La. 471, 137 So. 2d 298, 304 (1962) ). "Specifically, the issue in a particular case is whether [a] general duty extends to protect the plaintiff against the particular risk that occurred, in the particular manner in which it occurred. Put differently, does this defendant have a duty to protect this plaintiff against this risk that occurred in this manner?" 1-5 Frank L. Maraist & Thomas C. Galligan, Jr., Louisiana Tort Law § 5.01 (2004 ed., rev. vol. 2016). Louisiana also evaluates legal cause in terms of " 'the ease of association' which melds policy and foreseeability into one inquiry: Is the harm which befell the plaintiff easily associated with the type of conduct engaged in by the defendant?" *Roberts*, 605 So. 2d at 1054 (citation omitted).
>
> According to a recent statement by the Louisiana Supreme Court, "[w]hether this particular [defendant] owed this particular duty to the plaintiff[ ] in this particular factual context is a mixed question of law and fact." *Parents of Minor Child v. Charlet*, 2013-2879 (La. 4/4/14); 135 So. 3d 1177, 1181 (citing *Kenney v. Cox*, 95–0126 (La. 3/30/95); 652 So. 2d 992 (Dennis, J., concurring) (noting there is a "distinction between the existence of a general duty of care (a legal question) and the 'legal cause' or 'duty/risk' question of the particular duty owed in a particular factual context (a mixed question of law and fact)"); *Pitre v. Louisiana Tech Univ.*, 95–1466, 95–1487 (La. 5/10/96); 673 So. 2d 585, 596 (Lemmon, J., concurring; joined by Kimball, J.) (noting "[i]n the usual case where the duty owed depends upon the circumstances of the particular case, analysis of the defendant's conduct should be done in terms of 'no liability' or 'no breach of duty.' " ) ).

Thus, contrary to Defendants' position, legal causation is a question for the jury unless reasonable minds could not differ. See *Parents*, 135 So. 3d at 1181 ("the appellate court erred in dismissing plaintiffs' claims with prejudice as the question of duty/risk should be resolved by the factfinder at trial," particularly given the existence of material issues of fact. (emphasis added) ); see also *Fowler* [*v. Roberts*, 556 So. 1, 4–5 (La. 1989), abrogated on other grounds by *Gregor v. Argenot Great Cent. Ins. Co.*, 2002-1138 (La. 5/20/03), 851 So. 2d 959] ("The first element [of the duty-risk analysis] is usually a judge question, and the other four [ (which includes legal causation) ] are usually jury questions unless reasonable minds could not differ." (citing D. Robertson, W. Powers, Jr. & D. Anderson, Cases and Materials on Torts 83–84 (1989) ); *Chatman v. S. Univ. at New Orleans*, 2015-1179 (La. App. 4 Cir. 7/6/16); 197 So. 3d 366, 375 ("Although for years the issue of whether legal cause was a fact issue or a legal issue 'baffled scholars and courts,' in *Parents of Minor Child v. Charlet*, ... the Louisiana Supreme Court confirmed that legal cause is a mixed question of law and fact for the jury (or other fact-finder) to decide."); *Nicholson v. Calcasieu Par. Police Jury*, 96-314 (La. App. 3 Cir. 12/11/96); 685 So. 2d 507, 510–11 (noting contrary authority but finding that, under *Fowler*, "Cause-in-fact and legal cause are generally questions for the jury. The exception is when, under the uncontested facts, reasonable minds could not differ." (citing *Fowler*, 556 So. 2d at 4–5) ); Maraist & Galligan, Louisiana Tort Law § 5.02 ("legal causation is a mixed question of law and fact that the jury decides if reasonable minds could differ.... If duty is treated as an issue of law, and legal cause is treated as a mixed question of law and fact, there is a rational allocation of the decision-making function: the judge decides duty and the jury decides legal cause.").

*Tredick*, 2018 WL 5504157, at *4. *See also Olivier v. Exxon Mobil Corp.*, No. 18-568, 2022 WL 2092480, at *17 n.173 (M.D. La. June 9, 2022) (Dick, CJ).

In conclusion, the Court finds that there are significant issues of material fact on the issue of causation which require the resolution of a jury. As such, summary judgment is inappropriate.

## VIII.   CONCLUSION

Accordingly, for the reasons expressed above, **IT IS ORDERED** that *Equinor's Motion for Summary Judgment* (Doc. 37) is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>September 21, 2023</u>.


_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**